UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**          'O'

| Case No. | 2:16-cr-00073-CAS-12 | Date | March 27, 2017 |
|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | |
| Interpreter | N/A | | |

| Catherine Jeang | Laura Elias | Khaldoun Shobaki<br>Rebecca Shults |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond. | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 12) Daniel Fernando Huizar | X | X | | William Harris | X | | X |

**Proceedings:** DEFENDANT'S MOTION TO SUPPRESS (Dkt. 337, filed February 27, 2017)

## I.   INTRODUCTION

On January 31, 2016, the government filed a criminal complaint against defendant Daniel Fernando Huizar, among others, stating that defendant possessed with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vii) and that defendant aided and abetted the same offense, in violation of 18 U.S.C. § 2(a). Dkt. 1 ("Compl.").

On February 12, 2016, defendant was charged in a two-count indictment with (1) conspiring to possess at least 1000 kilograms of marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(vii); (2) aiding and abetting the same offense, in violation of 18 U.S.C. § 2(a). Dkt. 114. Defendant has entered a not-guilty plea. Dkt. 164.

On November 4, 2016, defendant filed a motion to exclude statements obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1960). Dkt. 280. On November 21, 2016, the government filed notice of its partial non-opposition to defendant's motion. Dkt. 286. The government stated that it did not seek to introduce defendant's statements in its case-in-chief, but sought to reserve its right to introduce the statements for impeachment and other permissible purposes and to preserve its right to introduce such statements should defendant open the door to such admission. Id.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**      **'O'**

On December 5, 2016, the Court granted defendant's motion to exclude statements obtained in violation of Miranda. Dkt 286 ("December Order"). Specifically, the Court concluded:

> If defendant testifies in his own defense, his un-Mirandized statements are admissible for impeachment purposes if "defendant open[s] the door to the impeaching evidence by testifying to the point on direct [examination]." Accordingly, for the purposes of the government's case-in-chief, the Court **GRANTS** defendant's motion to exclude defendant's statements taken in violation of Miranda.

Id. (citations omitted).

On February 27, 2017, defendant filed the instant motion to suppress the papers and effects seized incident to his arrest, which he contends was unlawful. Dkt. 337 ("Motion"). The government filed its opposition on March 6, 2017, dkt. 342 ("Opp'n"), and defendant filed his reply on March 14, 2017, dkt. 364 ("Reply").

## II. BACKGROUND

On January 30, 2016, a panga boat landed on or in the vicinity of Arroyo Quemada Beach ("AQ Beach"), also known as Tajiguas Beach, in Santa Barbara County. Motion at 3; Opp'n at 1. The parties dispute the nature of AQ Beach. The government contends the beach is remote and isolated, more than 23 miles from the nearest town, Buellton. Opp'n at 2. By contrast, defendant contends that AQ beach is a public beach, near a residential community, with free public parking on the road adjacent to the beach. Reply at 4.

After the boat landed, packages were offloaded and carried from the boat toward the road. Motion at 3; Opp'n at 2. Three "off-load" vehicles, including on minivan, departed from the beach between 2:22 a.m. and 2:47 a.m. Motion at 3; Opp'n at 2. Law enforcement followed the three vehicles and eventually stopped and arrested the suspects in each vehicle. Compl. ¶ 12. Detective Christopher Dallenbach followed and stopped the minivan—which contained parts of a boat engine, a GPS, and several cell phones—and arrested the four individuals inside. Dkt 342-1, Declaration of Christopher Dallenbach ("Dallenbach Decl.") ¶ 9. Dallenbach then returned to AQ Beach to see if additional suspects remained there. Id. ¶ 11. Before arriving at the beach, Dallenbach learned that law enforcement had stopped the two other off-load vehicles, which contained large quantities of marijuana. Id. ¶ 10.

At approximately 4:45 a.m., Dallenbach located defendant in the brush near the beach. Motion at 4; Opp'n at 4. Dallenbach drew his weapon, which is equipped with a flashlight, and

ordered defendant to stand up with his hands in the air.  Motion at 4, Opp'n at 4.  The parties disagree as to whether defendant immediately complied with Dallenbach's order.  Motion at 4; Opp'n at 4.  According to Dallenbach, defendant complied only after Dallenbach ordered defendant to stand with his hands up a second time.  Dallenbach Decl. ¶ 4.  Defendant observed Dallenbach holster his weapon.  Dkt 337, Ex. A, Declaration of Daniel Huizar ("Huizar Decl.") ¶ 2.

Dallenbach handcuffed defendant, walked him back to the main road, and began to direct questions at defendant.  Dallenbach Decl. ¶¶ 16–17; Huizar Decl. ¶¶ 4–6.  Dallenbach asked defendant how he got to the beach, and from where.  Dallenbach Decl. ¶ 17; Huizar Decl. ¶ 5.  Defendant answered that he walked along the beach from Buellton.  Dallenbach Decl. ¶ 17; Huizar Decl. ¶ 5.  Dallenbach was aware that Buellton is approximately 23 miles from the AQ Beach, and that the beach is often inaccessible between Buellton and AQ Beach.  Dallenbach Decl. ¶ 17.

Incident to his arrest, officers seized defendant's personal papers and effects, including $51.55, a receipt for Motel 6, and a Domino's business card.  Motion at 5.

## III. LEGAL STANDARDS

Searches incident to arrest are exempted from the warrant requirement of the Fourth Amendment.  Arizona v. Gant, 556 U.S. 332, 338 (2009).  Such searches are justified as a means to find weapons the arrestee might use or evidence the arrestee might conceal or destroy.  Chimel v. California, 395 U.S. 752, 762–63 (1969).  This doctrine permits "a police officer who makes a lawful arrest [to] conduct a warrantless search of the arrestee's person and the area within his immediate control."  Davis v. United States, 564 U.S. 229, 232, (2011).

"The Fourth Amendment requires that a law enforcement officer have 'probable cause' to arrest an individual without a warrant."  United States v. Jensen, 425 F.3d 698, 704 (9th Cir. 2005).  "Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule."  United States v. McClendon, 713 F.3d 1211, 1215 (9th Cir. 2013).

The test for whether probable cause exists is whether "at the moment of arrest the facts and circumstances within the knowledge of the arresting officers and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."  Jensen, 425 F.3d at 704; see also United States v. Buckner, 179 F.3d 834, 837 (9th Cir. 1999) ("Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would

have concluded that there was a fair probability that [the defendant] had committed a crime." (quotation marks omitted)). In determining whether an officer had probable cause to conduct a warrantless arrest, "[t]he court may take into account the experience and expertise of law enforcement agents who observed the defendant's activity." United States v. Valencia, 24 F.3d 1106, 1108 (9th Cir. 1994); see also Buckner, 179 F.3d at 837 ("In drug investigations, the court may consider the experience and expertise of the officers involved. This experience and expertise may lead a trained narcotics officer to perceive meaning from conduct which would otherwise seem innocent to the untrained observer." (citation omitted)).

## IV. ANALYSIS

Defendant argues that the moment of his arrest occurred when Dallenbach rousted him from the brush at gunpoint, and Dallenbach lacked probable cause for this arrest.

The government, by contrast, argues that Dallenbach's initial interaction with defendant—specifically, ordering defendant stand with his hands raised, pointing a weapon at defendant, and questioning defendant about his purpose for being on the beach—constituted a valid investigatory detention under Terry v. Ohio, 392 U.S. 1 (1968). Opp'n at 5. The government further argues that Dallenbach had probable cause to arrest defendant.

The Court first determines when the moment of arrest occurred. Whether the Court "deem[s] a particular detention a Terry stop or an arrest is of great importance because the decision we make will frequently determine whether the police conduct was lawful or not." Washington v. Lambert, 98 F.3d 1181, 1185–86 (9th Cir. 1996). If the Court "conclude[s] that the detention was only a 'stop' it will be lawful even though there was no probable cause. If, under the same circumstances, [the Court] term[s] it an arrest, it will not be lawful in the absence of such cause. In the latter case, the evidence seized will be excludable." Id. at 1186. "Under ordinary circumstances, drawing weapons and using handcuffs are not part of a Terry stop. Nevertheless, we allow intrusive and aggressive police conduct without deeming it an arrest . . . when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." United States v. Miles, 247 F.3d 1009, 1012 (9th Cir. 2001) (citation and quotation marks omitted); see also Washington, 98 F.3d at 1187 ("Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment."). Recognizing "the absence of a bright-line rule," the Ninth Circuit has "only allowed especially intrusive means of effecting a stop in special circumstances, such as

> 1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the police have information that the suspect is currently armed; 3) where the stop closely follows a violent crime;

and 4) where the police have information that a crime that may involve violence is about to occur. Clearly, some combination of these factors may also justify the use of aggressive police action without causing an investigatory stop to turn into an arrest.

<u>Washington</u>, 98 F.3d at 1189–90 (citation omitted). The Court finds that the only "special circumstance" potentially present here is defendant's lack of initial cooperation with Dallenbach's order (which defendant disputes). Even if defendant complied only after Dallenbach's second order to stand up with his hands raised, the Court finds that this is not the type of uncooperativeness that would require intrusive techniques as part of an investigative detention under <u>Terry</u> because this did not appear to increase the "inherent danger of the situation." See <u>id.</u> at 1186–87. Furthermore, the Court finds that "[a] reasonable person in this situation" would not have believed that he was free to go. See <u>Kraus v. Pierce Cty.</u>, 793 F.2d 1105, 1109 (9th Cir. 1986). The Court therefore concludes that defendant was under arrest when Dallenbach told defendant, at gunpoint, to stand up with his hands raised.

Accordingly, the Court next considers whether there was probable cause for defendant's arrest. The government appears to articulate six bases for probable cause: (1) AQ beach was remote and difficult to access; (2) Dallenbach returned to AQ Beach shortly after off-load vehicles, transporting contraband, left the beach; (3) law enforcement had monitored the sole access point to AQ beach,[1] and defendant did not appear to have his own transportation to the beach and had not arrived since the entrance had been monitored; (4) Dallenbach knew there were an unknown number of people offloading the contraband and, in his experience, suspects are frequently found on the beach even after some vehicles have departed; (5) Dallenbach knew that all three of the offloading vehicles had been stopped, potentially disrupting planned transportation for anyone still waiting on the beach; (6) defendant's behavior upon discovery, including that defendant was "hiding" under low slung brush, that defendant did not immediately respond to Dallenbach's command to come out of the brush, and that defendant "obvious[ly] lie[d]" about walking over 20 miles to the AQ Beach from Buellton.[2] Opp'n at 6–10. Defendant argues that Dallenbach did not have probable cause because there was no individualized suspicion, "save for proximity and timing[,]" which alone cannot give rise to probable cause. Motion at 7–8 (quoting <u>United States v. Collins</u>, 427 F.3d 688, 692).

---

[1] The government does not specify exactly when the Santa Barbara Police Department began surveilling the point of entry.

[2] Because "[f]acts uncovered after the arrest are irrelevant," <u>United States v. Collins</u>, 427 F.3d 688, 691 (9th Cir. 2005), the Court does not consider defendant's answers to Dallenbach's questions, which occurred after the moment of arrest.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL           'O'**

Defendant is correct that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Ybarra v. Illinois, 444 U.S. 85, 86 (1979). However, the Court also recognizes that "the standard for probable cause is not terribly demanding." United States v. Collins, 427 F.3d 688, 691 (9th Cir. 2005).[3] Furthermore, Dallenbach did not rely *only* on defendant's close geographical and temporal proximity to the off-loading of the panga boat. The Court finds that the totality of the circumstances—specifically, (1) Dallenbach's experience that suspects are frequently found on the beach even after some vehicles have departed; (2) his knowledge that all three off-loading vehicles had been stopped and could not return to pick up any remaining

---

[3] Defendant argues that the facts in Collins are analogous to those present here. Motion at 7. In Collins, Michael Pass met a confidential informant in a parking lot next to an office building. 427 F.3d at 690. Pass told the informant that his "guys" would arrive within ten minutes with more checks. Id. Shortly thereafter, and at approximately the same time, two cars—a Cadillac and a Corolla—pulled up on either side of Pass's car. Id. Edgardo Flores entered Pass's vehicle, though it was not clear where Flores came from. Id. Agents next observed the defendant, Gwaine Collins, standing next to the Corolla and talking to its driver. Id. It was not clear where Collins came from. Id. Pass and Flores got out of Pass's car and approached the office building; they were arrested inside. Id. at 691. Collins entered a Quizno's restaurant that bordered the parking lot, purchased a drink, and walked out of the restaurant. Officers then arrested Collins and the driver of the Corolla. Id. The Ninth Circuit concluded that federal agents lacked probable cause to arrest Collins.

> [T]he only thing the agents knew about Collins was that he had shown up (perhaps in the white Cadillac) in a public parking lot, had talked briefly to the driver of another car in that lot, and had gone into a fast-food restaurant and purchased a drink. It is true that the agents were expecting a person or persons to arrive in the lot who would be carrying stolen checks. At least one such person, Flores, did arrive and was carrying checks. Entirely missing, however, was any connection between Collins and Flores other than the fact that they appeared (from somewhere) in a public parking lot relatively contemporaneously. Equally missing is any connection between Collins and Pass. These facts did not give rise to a fair probability that Collins was part of the conspiracy. . . . The facts showed only that Collins was close to the wrong people at the wrong time.

Id. Unlike the present case, there was a plausible, non-criminal explanation for Collins' presence in a public parking lot that was *directly* adjacent to an office building and a restaurant, from which Collins made a purchase. By contrast, defendant was hidden from view, in the dark, at 4:45 a.m. at a largely deserted (even if not remote) beach. Accordingly, the Court finds that probable cause was based on more than "proximity and timing." See id. at 692.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES – GENERAL            'O'

crew members; (3) his discovery of defendant in the brush; (4) defendant's presence at a beach (regardless of its remoteness) at 4:45 a.m., before the sun had risen; *and* (5) defendant's geographical and temporal proximity to the site where other suspects had offloaded large quantities of marijuana—was sufficient to warrant a prudent person to believe that defendant had committed a crime. Accordingly, the Court finds that Dallenbach had probable cause to arrest defendant and, therefore, **DENIES** defendant's motion to suppress the papers and effects recovered during the search incident to defendant's lawful arrest.[4]

## V. CONCLUSION

In accordance with the foregoing, the Court **DENIES** defendant's motion to suppress the papers and effects seized incident to his arrest.

IT IS SO ORDERED.

|  | 00 : 20 |
|---|---|
| Initials of Deputy Clerk | CMJ |

---

[4] In light of the government's stipulation regarding defendant's un-Mirandized statements, the Court does not by this order intend to make any ruling on the admissibility of defendant's statements following his arrest. Leaving those statements aside, the remainder of the totality of the circumstances support a finding of probable cause.